1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                        - - -

4   DEBORA NOVAKOWSKI,                    )
                                          )
5              Plaintiff,                 )
                                          ) Civil Action
6         vs.                             ) No. 04-356E
                                          )
7   ELAINE CHAO, SECRETARY, AND THE       )
    UNITED STATES DEPARTMENT OF LABOR,    )
8                                         )
               Defendant.                 )
9                        - - -

10            Deposition of JOHN STRANAHAN

11          Friday, January 27, 2006

12                       - - -

13
          The deposition of JOHN STRANAHAN, called as a
14   witness by the Plaintiff, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the
15   taking of depositions, taken before me, the
     undersigned, Melissa L. Fenster, a Notary Public in
16   and for the Commonwealth of Pennsylvania, at 17 South
     Park Row, Room A330, Erie, Pennsylvania  16501,
17   commencing at 10:26 o'clock a.m., the day and date
     above set forth.

18                       - - -

19
              COMPUTER-AIDED TRANSCRIPTION BY
20            MORSE, GANTVERG & HODGE, INC.
                  ERIE, PENNSYLVANIA
21                 814-454-6655

22                       - - -

23

ORIGINAL
25

```
 1        questions since they're subsequent to the

 2        selection.

 3        Q     Okay.

 4              Were any of those GS-13s in the Erie office

 5   selected subsequent to May of 2001?

 6        A     No.

 7        Q     Or prior to that, except Chimelewski?

 8        A     They were all prior to that.

 9        Q     Is there a sexual harassment policy in

10   effect at OSHA?

11        A     I'm sure there is.

12        Q     Have you ever seen it?

13              MR. SKIRTICH:  Again, for the record,

14        when?

15              MR. LINKOSKY:  Well, all right.  We'll

16        just --

17              MR. SKIRTICH:  I mean for timing for the

18        record, I think that's pertinent.

19              MR. LINKOSKY:  I appreciate that, Paul,

20        yeah.

21        Q     During the period of time relevant to this

22   case, was there a sexual harassment policy in effect

23   in OSHA?

24        A     I think it's department wide.

25        Q     Have you ever seen it?
```

1    A    I've seen brochures about it.  If you're

2    asking have I seen a statute or a regulation or

3    anything like that, no, but I've seen brochures in

4    training about it.

5    Q    Have you seen anything regarding sexual

6    harassment that would be in any way comparable to

7    Exhibit No. 3, which is a recitation of a policy and

8    procedure?

9        Take a look at Exhibit No. 3.  I mean, did

10    you see anything like that?

11    A    No.

12    Q    Okay.

13        How would you find out what your role would

14    be in enforcing the sexual harassment policy?

15    A    Probably through pamphlets or brochures, or

16    I'm sure we've had different training sessions about

17    it.

18    Q    When was the last training session that you

19    recall that you had regarding sexual harassment during

20    the period that we are talking about here?  I'm not

21    asking you questions after May of 2001.

22    A    Prior to May 2001?

23    Q    Yes.

24    A    I can't -- I don't know.

25    Q    Okay.

1          Do you recall any instruction regarding the

2     policy that you were to investigate?  As the area

3     director, you would investigate incidents that could

4     or did cause a sexually hostile environment in the

5     office?

6          A     That would be my responsibility.

7          Q     Now, did anybody else in the office have

8     that responsibility?

9          A     I believe the supervisors would have a role

10     in that.

11          Q     Would it be your ultimate responsibility to

12     make any determinations or investigations?

13          A     I would have reporting requirements.

14          Q     To whom?

15          A     I think there's -- I report those things to

16     a coordinator someplace.

17          Q     Do you mean a regional office?

18          A     It might be the EEOC.  I don't know.

19          Q     Let's go back and see if we can get some

20     details about that.  If you were confronted with some

21     sexual harassment or a sexually potentially sexual --

22     strike that.

23          If you were confronted with an incident of

24     sexual harassment or incident or incidents which might

25     cause a sexually hostile atmosphere, did you have a

1    reporting requirement to report them to someone?

2        A      I think if a complaint is raised to me.

3        Q      Okay.

4                Is it your position that the only time you

5    had an obligation to deal with sexual harassment or

6    incidents which may cause a sexually hostile

7    atmosphere is when somebody made a complaint?

8        A      Unless I witnessed it, and it crossed the

9    threshold of what I would understand to be a condition

10   that creates a hostile work environment.

11       Q      Once that occurred, what were you to do?

12       A      I would probably try to intervene.

13       Q      Had you ever intervened?

14               MR. SKIRTICH:  Again, I think for purposes

15       of the record, when time wise?

16               MR. LINKOSKY:  I thought we had established

17       that.  We're talking about the period relevant to

18       this.

19               MR. SKIRTICH:  Fair enough.

20               The question is have you ever intervened

21       prior to the job --

22       Q      You said, Mr. Stranahan --

23       A      On a sexual harassment?

24       Q      Or a sexually hostile issue.

25       A      I don't think there was an occasion to.

1    Q    Does that mean in your personal judgment

2  you didn't think there was an occasion to?

3    A    Correct.

4    Q    So the answer is no?

5    A    Correct.

6    Q    And is that judgment made within your

7  knowledge of the sexual harassment policy?

8    A    I'm a little confused as to whether or not

9  you're getting at a situation that involved a conduct

10  issue in my office that I know you're aware of.  If

11  you're referring to that, yes, I did intervene.

12    Q    Actually, I wasn't referring to that yet.

13    A    Okay.

14    Q    I was just asking -- what I'm trying to get

15  at, Mr. Stranahan, is your understanding of a couple

16  different things.

17        What was the policy, and what was your

18  reaction to incidents that you saw fell within the

19  policy, and how did you know they fell within the

20  policy?  That's what I'm trying to get at.  I may not

21  be very efficient at it, but that's what I'm trying to

22  get at.

23    A    Well, during the time in question, I don't

24  think there was a sexual harassment incident that

25  required an intervention.

1       Q      Okay.

2              And is that determination principally based

3    on the idea that you didn't get a formal complaint?

4    Is that right?

5       A      In part.

6       Q      In part, and what else other than it?

7       A      In that I didn't witness anything so overt

8    or out of the social norms of the office that would

9    rise to that level.

10      Q      But the question that keeps coming to my

11   mind, Mr. Stranahan, is how did you know to set that

12   level, that determination, how did you know that?

13      A      I would say that I did not believe an

14   environment existed so as to make anyone in my office

15   uncomfortable with the social norms that existed

16   there.

17      Q      Did you ever make any inquiry or ask for

18   the policy in order to assist you with making that

19   determination, that is whether your view of that

20   situation, those situations was consistent with the

21   DLO policy?

22             Did you ever do that?

23      A      Did I ever ask anyone to send me a policy,

24   no.

25      Q      Or make any effort to find out if your view

1  of the incidents were consistent with the DLO policy?

2      A      I base it on what I understand to have

3  received in my training.  Like unwanted and repetitive

4  advances, I would know that, but that did not occur;

5  or unwanted touching or anything of that nature, I

6  don't believe they occurred.

7      Q      Now, are there any other circumstances

8  which you believe would reach the level which would

9  require your intervention than you've just mentioned,

10  or is that a complete list?

11      A      Those two examples, is that my complete

12  list?

13      Q      Yes.

14      A      Those are examples.  I'm sure it's not a

15  complete list.

16      Q      How about filling out the list for me as

17  far as you understand it to be?  What I'm trying to

18  get at, Mr. Stranahan, is what you consider to be

19  sufficient to require your intervention.  Now, you've

20  mentioned two kinds of incidents.

21          What else is there to require your

22  intervention?

23      A      Under the umbrella of it being offensive to

24  somebody.

25      Q      Did you ever look at any incidents and

1    anticipate whether they may or may not have been

2    offensive to people?

3      A     Well, I guess I would have to rely on

4    people letting me know that they were offensive.

5      Q     So unless you got a complaint, somebody

6    said I'm offended by this, then you didn't feel it was

7    your obligation to intervene?

8      A     Unless someone raised something to my

9    attention or complained, I would not feel it necessary

10    to intervene.

11      Q     I think that answers the question.

12          Now, this is an incident -- I think you are

13    probably anticipating the stuff we already know about

14    and talked about before -- where a male in your office

15    was accused of exposing himself to cleaning women.

16          Do you recall that?

17      A     Yes.

18      Q     Did you investigate that?

19      A     Yes.

20      Q     Did you interview the cleaning ladies?

21      A     No.

22      Q     Who did you interview?

23      A     I interviewed the person who was --

24          MR. SKIRTICH: You could use the word

25    offender for purposes of this.

1     A     I interviewed the person who was alleged to
2   have done it.
3     Q     But you didn't ask the cleaning ladies
4   about it?
5     A     I didn't know who the cleaning ladies were.
6     Q     Did you speak to their supervisor?
7     A     No.
8     Q     Did you get an explanation from the alleged
9   offender?
10     A     Yes.
11     Q     Did you accept that explanation?
12     A     It seemed quite plausible.
13     Q     Now, do you recall --
14         MR. SKIRTICH:  Hold on a second.  For
15     purposes of the record, time wise when was this?
16         MR. LINKOSKY:  I thought that, first of
17     all, this is my deposition.
18         MR. SKIRTICH:  I understand, but for
19     purposes --
20         MR. LINKOSKY:  And, you know, I don't think
21     at this stage in the game that's a proper
22     question for him.
23         MR. SKIRTICH:  Well, I do, and I'll object.
24     When was this?  Was this before May of 2001?
25         MR. LINKOSKY:  It occurred before.  Don't

1        forget we have established -- I'm not going to ask

2        any of this stuff that occurred after May of

3        2001.

4              MR. SKIRTICH:  All right.

5              MR. LINKOSKY:  There is something that I

6        might ask him, but all of this is before May of

7        2001.

8              MR. SKIRTICH:  Thank you.

9        Q     Now, do you recall in our private session

10   of this kind where we talked about Mr. Chimelewski

11   making a sexist remark about a female in the presence

12   of an employer?

13        A     I think I responded to that in my

14   affidavit.

15        Q     But you do recall that?

16        A     Yes.

17        Q     We talked about that, right?

18              MR. SKIRTICH:  When was this now?

19              MR. LINKOSKY:  Prior to May of 2001.

20        Q     Did you investigate that allegation?

21        A     If it's the -- if you're referring to when

22   Mr. Chimelewski -- part of his duties would be to

23   train new employees, one of which was a female around

24   1991 or so.  I got wind of that, but not by the female

25   employee.

1           MR. SKIRTICH:  For purposes of the record,

2       put her name on the record or else we're going to

3       have -- there's no way to track this.

4           MS. NOVAKOWSKI:  Do you want her name at

5       the time?  Teresa Sipple, S-I-P-P-L-E.

6           MR. SKIRTICH:  Thank you.

7       Q    So you found out about it through some

8   other means.

9            How?

10      A    Probably through the complainant.

11      Q    And you're speaking of Ms. Novakowski?

12      A    Ms. Novakowski.

13      Q    She brought that to your attention?

14      A    I don't think it was a situation where she

15  came in to say I got this complaint.  It was more

16  like, did you hear what Joe said or did?

17      Q    But that brought it to your attention,

18  correct?

19      A    She was -- Ms. Novakowski was the one who

20  informed me.

21      Q    Yeah.

22           She brought it to your attention?

23      A    Yeah.

24      Q    What did you do about it?

25      A    Based upon that, I did nothing about it.

1    Q    Now, you're aware of this issue of at least

2   one employee in your office accessing pornography,

3   printing out pornography, things of that nature,

4   correct?

5    A    Yes.

6    Q    When did you first find out that that was

7   going on approximately?

8    A    Well, it's a guess, but I'll say '95, 1995.

9        MR. SKIRTICH:  I'm going to object to

10       relevance to the last question and any other

11       questions concerning this.

12       You have to answer for purposes of the

13       deposition.  Go ahead.

14       MR. LINKOSKY:  Do you want to clarify just

15       exactly what you mean by "this"?

16       MR. SKIRTICH:  The question that you just

17       asked about accessing pornography.  I am

18       objecting based on relevance to this lawsuit, so

19       the first question you asked concerning, I

20       object, and I will object to each and every time

21       for purposes of the record.

22       MR. LINKOSKY:  Is that a general objection

23       regarding all these questions?

24       MR. SKIRTICH:  It is, but I think for

25       purposes of deposition, I don't think courts

 1        recognize general, so I just may have to say

 2        object.  Relevance.

 3             But go ahead.  You have to answer.

 4        Q    In 1995, right?

 5        A    I'm guessing.

 6        Q    What did you do about it is the obvious

 7   next question?

 8        A    What incident are you referring to?

 9        Q    Well, the first time you found out that

10   someone in your office was accessing pornography?

11        A    My recollection was that a pornographic

12   photocopy was found in our copy room.

13        Q    And that was brought to your attention by

14   whom?

15        A    I believe it was by Mr. Burbage, and I

16   believe it was brought to his attention by

17   Beverly Spare, and I'm not certain of that.

18        Q    And is Mr. Burbage a supervisor in your

19   office?

20        A    Yes.

21        Q    And what did you do as a result of gaining

22   that information?

23        A    I believe Barry and I confronted the person

24   that was suspected.  There were no witnesses to this

25   other than finding the piece of paper.  No one

1  actually saw him copying it, if he actually did, which

2  probably he did, and we counseled him.

3      Q    Did he admit to doing it?

4      A    I don't recall.

5      Q    When you say "counsel," what do you mean by

6  that, Mr. Stranahan?

7      A    We wanted to know if he did it, and that

8  that was a serious breach of conduct and that he

9  absolutely cannot use government computers to go to

10 such sites.

11     Q    Did you report that to any superior of

12 yours or to your regional office?

13     A    I don't think so.

14     Q    Did you ask for any guidance relevant to

15 the policy?  A woman saw a pornographic photograph,

16 brought it to the attention of a supervisor?  Did you

17 go to anybody in personnel at the regional office and

18 say, okay.  What do I do if there's a violation of the

19 policy?

20          MR. SKIRTICH:  Objection.  Relevance.

21          Go ahead.

22     A    Inasmuch as there was question as to did

23 this person actually do it or not, we counseled, and I

24 did not go outside my office.

25     Q    Okay.

1          Did you make any effort aside from

2    questioning this person as to find out whether or not

3    he actually did it?

4          MR. SKIRTICH:  Objection.  Relevance.

5    A     I don't know how you would do that.

6    Q     Okay.

7          Did you call anybody in to look at his

8    computer to see whether he did it?

9    A     No.

10   Q     Did you discipline him other than

11   counseling?

12   A     No.

13   Q     Did you ever send that individual to

14   counseling?

15   A     Yes.

16   Q     When did that occur?

17        MR. SKIRTICH:  Again, all of these, I'm

18        objecting on relevance.

19        But go ahead.

20   A     I believe that occurred after the first

21   instance, and I believe it occurred when Mr. Burbage

22   caught sight of something that was on his screen that

23   caused alarm to Barry.

24   Q     Did women complain to you about seeing

25   things on that individual's computer screen that were

1  offensive?

2      A     No.

3      Q     So do I understand correctly Mr. Burbage

4  saw something else subsequent to the picture?

5      A     Yes.

6      Q     And you did what?

7      A     Barry and I brought the individual into my

8  office; and in the strongest terms   see.  We've had

9  a lot of training on this.

10           In fact, in another incident, I had to

11  provide documentation of all of this; and through

12  staff meetings and computer security training, he was

13  aware of all of that.  And in the strongest terms, I

14  said simply this is not allowed; and if I catch you

15  again, I'm going to do what I can to see you're fired.

16      Q     But you sent him for counseling?

17      A     I believe we did.

18      Q     Is there a program within the Department of

19  Labor called an employee assistance program where

20  employees having different kinds of problems can be

21  referred?

22      A     Yes, and that's what happened in this case.

23      Q     Did you follow up as to whether or not he

24  continued with the counseling?

25      A     I know that he went.

1     Q     How many times?

2     A     I don't know.

3     Q     Did you ever get complaints to the male

4     supervisor, Burbage, specifically who's abusive to

5     women, swore at them, treated them badly in the

6     office?

7     A     No.

8     Q     Were you aware of that kind of conduct?

9     A     I don't think Mr. Burbage swears for one

10     thing.

11     Q     Were you aware that Mr. Burbage was abusive

12     to women in the office?

13          MR. SKIRTICH:  Objection.  Relevance.

14     A     I don't think Mr. Burbage is abusive to

15     women.

16     Q     So regardless of his conduct, you didn't

17     think he was abusive.

18          Is that what you're telling me?

19          MR. SKIRTICH:  Objection to the form of the

20          question.  That's not what the witness testified

21          to.

22     Q     What conduct of Mr. Burbage did you witness

23     that you would have to make that kind of a

24     determination as to whether it was abusive to women?

25     A     What I think you're referring to is

1  Mr. Burbage being a supervisor; and, perhaps, somebody

2  doesn't like how they're being supervised or maybe

3  they don't like criticism about their case files or

4  maybe they don't like criticism about how they're

5  using their sick leave or annual leave.

6        That person might go and say Barry's

7  picking on me, picking on the person because the

8  person needs to do maybe a little bit better; and if

9  you're going to say that that is in the realm of

10 abuse, I disagree.

11    Q    Okay.  I'm not calling it abuse or not,

12 Mr. Stranahan.  I'm only trying to get some answers to

13 questions here.

14        Did you observe the conduct of Mr. Burbage

15 in performing his supervisory duties?

16    A    I observed that every day.

17    Q    And did you observe regardless of his

18 intent that his manner could be construed as abusive

19 to women?

20        MR. SKIRTICH:  Objection to the form of the

21        question.  He has already answered this.

22        But go ahead and answer that again.

23    A    I don't know whether I'm qualified to

24 interpret what someone's intent or interpretation of

25 intent is.

1    Q    You just talked about his intent.  You

2  talked about people and their performance, use of sick

3  leave and things of that nature.  The question I'm

4  asking you is -- and I understand those are

5  supervisory functions.

6        The question I'm asking you is the manner

7  in which those functions were carried out.  In your

8  opinion, could it be construed to be abusive to

9  females?

10   A    And I would say no.

11        MR. LINKOSKY:  Okay.  Off the record.

12        (Discussion held off the record.)

13   Q    There has been a recent investigation

14  within the last year or so of pornography in the Erie

15  office; isn't that correct?

16        MR. SKIRTICH:  Objection.  Relevance.

17   A    Yes.

18   Q    And I'm not going to mark this as an

19  exhibit, but I want to show you a letter, and I just

20  want to ask you if that's your signature.

21        MR. SKIRTICH:  For purposes of the record,

22        let's identify it.  Even though you're not going

23        to mark it, I think because I may object and

24        strike it later --

25        MR. LINKOSKY:  I just want to know if

1          that's his signature first.

2     A     Yes, that's my signature.

3     Q     And it's addressed to an employee of your

4  office?

5     A     That is correct.

6     Q     And it's dated July 13, 2005?

7     A     Yes, it is.

8     Q     And it's on Department of Labor stationary,

9  and the subject is notice of proposed suspension?

10    A     That is correct.

11          MR. LINKOSKY:  Off the record.

12          (Discussion held off the record.)

13    Q     Is the person to whom this is addressed an

14  employee of the Erie office?

15    A     Correct.

16    Q     Is this the same person who was involved in

17  the incident of allegedly exposing himself to the

18  cleaning ladies, the printout of the pornographic

19  picture and what Mr. Burbage witnessed on his computer

20  screen?

21    A     Yes.

22    Q     And according to this letter, his conduct

23  continued at least until April of 2005, correct?

24    A     I believe so.

25    Q     And beyond that date, correct?

1           MR. SKIRTICH:  Again, objection.

2           MR. LINKOSKY:  Okay.

3     Q     Want to see it?

4     A     I don't know what the dates are in there.

5  I know it's quite extensive.

6     Q     Well, my question was did it go beyond

7  April of 2005?

8     A     Yes.

9     Q     Now, this letter refers to a policy

10  identified as 5-CFR 2635.704(a).

11          What is that policy?

12    A     Where are you referring to?

13    Q     Here (indicating).

14          MR. SKIRTICH:  If you know.

15    Q     If you know.

16    A     It says he can't use government property

17  for unauthorized uses.

18    Q     Okay.

19          Just as a matter of curiosity, that goes

20  beyond sexual use, right?

21          MR. SKIRTICH:  Objection.  Relevance.

22    A     I suppose it does.

23    Q     Now, did you ever learn during the course

24  of Mr. Watson's tenure that he was spending one to

25  two hours a day on the computer looking at

1   pornography?

2           MR. SKIRTICH:  Objection.  Relevance.

3   A       Did I know he was doing that?

4   Q       Yes.

5   A       No, I did not.

6   Q       Was that reflected in his performance?

7           MR. SKIRTICH:  Objection.  Relevance.

8   Q       I mean this guy's spending up to 25 percent

9   of his time based on his own statement looking at

10  pornography on the computer, and I'm asking you did

11  that affect his performance as far as you saw?

12          I'm not saying you saw it.  I'm saying this

13  guy's working four to six hours a day as opposed to

14  somebody working eight.  That's what I'm talking

15  about.

16          Was that reflected in his performance?

17          MR. SKIRTICH:  I'm going to object on

18      two bases; No. 1, that was about four questions;

19      No. 2, again, is relevance to this lawsuit.

20          Now, we're so far afield, we're getting

21      into discipline of another employee for

22      unauthorized use of government property if I

23      understand the line of questioning, so before you

24      answer anything, you have to get one question at

25      a time please.